DISSENT
MARTHA CRAIG DAUGHTREY, Circuit Judge,
dissenting.
Because I conclude that the district court erred in failing to grant the defendant judgment as a matter of law, and because the majority has failed to apply controlling Kentucky state precedents on review of the district court’s decision, I respectfully dissent. The question of “bad faith” is one of law for the court’s determination, not a question of fact for the jury, and a claim of bad faith requires a showing of intentional wrong-doing or recklessness, neither of which was established by the proof in this case.
The majority is correct in its narration of the facts in Section I., as far as that narration goes. The record now before us reflects that Kenneth Riddle suffered from *411 several long-term, serious medical conditions, most of which were not revealed in his application for insurance and any one of which, when discovered, would have rendered him completely uninsurable or, at the very least, uninsurable for the premium originally quoted. But the majority’s recitation of the facts concerning the processing of the Riddle application fails to set out significant information concerning the review of the applicant’s medical file and the conclusions to be drawn from that review, as reflected in the testimony of several witnesses for the defense. Under controlling Kentucky case law, that evidence establishes that the company acted in good faith in declining to issue a policy of life insurance in this case.
The majority may also be correct in the legal analysis provided in Section II.A. with regard to conditions precedent under Rohde v. Massachusetts Mutual Life Insurance Co., 632 F.2d 667 (6th Cir.1980), and the question of whether the Ohio rule of contract law discussed in that opinion is equally applicable to Kentucky contract law. That question, however, is simply irrelevant to the determination of this appeal. The error in the majority’s analysis comes in the conclusion at the end of Section II.A. that “[s]o long as the plaintiffs produced sufficient evidence to convince a reasonable jury that the defendant rejected Riddle’s application in bad faith, the fact that Southern Farm might have found Riddle uninsurable had [it] acted in good faith is not relevant under Kentucky law.” Under Kentucky law, however, the question of bad faith is initially one for the trial court, not the jury, and a finding of bad faith cannot be based, as the majority would have it here, on a finding of nothing more than the fact that the application was subjected to heightened scrutiny following the death of the applicant.
Finally, the majority is correct to rely on the opinion in Investors Syndicate Life Insurance & Annuity Co. v. Slayton, 429 S.W.2d 368 (Ct.App.1968), which — in the absence of a definitive treatment of the issue by the Kentucky Supreme Court — is apparently the leading case on “conditional receipts” under Kentucky insurance law. But the majority has relied on only selective portions of the opinion in Slayton, conveniently omitting any reference to or discussion of the relevant rulings in that case.
In Slayton, the court, as here, was asked to review a jury verdict in favor of the beneficiary of an applicant for life insurance who was killed in an accident within days after mailing the application to the home office of the defendant insurance company. Although the opinion does not indicate when the company received notice of John Slayton’s death, clearly the company learned of it during its investigation of Slayton’s medical history as a result of having contacted his father to get permission to inspect the son’s medical records. That investigation revealed that Slayton was medically uninsurable on the day of the application, and the company declined to issue the policy.
The investigation also revealed that Slayton — like Riddle — had made material misrepresentations on the application, setting up a defense for the insurance company that was presented to and rejected by the jury that heard Slayton’s case. On appeal, the Kentucky Court of Appeals determined that the materiality of the misrepresentations in the application was not the controlling issue, however, and focused instead on “whether any contract of insurance ever came into existence,” which was the insurance company’s alternate defense and the same question that concerns us here:
*412 It is to be remembered that the death occurred before the company had taken any action on the application. So if Slayton was insured when he died it was because of the “Conditional Receipt” [contained in the application], which was the only basis of the obligation of the company at the time of death.
The “Conditional Receipt” was as follows:
“The insurance shall be effective as on the date of this receipt or the date of completion of medical examination ordinarily required by company, whichever is later, if Company at its home office shall be satisfied that on said date the person or persons proposed for insurance were in good health and insurable on the plan applied for, and at the premium rates stated in the application.”
429 S.W.2d 368, 370.
The Slayton court also recognized that this conditional receipt created a valid contract, described straightforwardly in the following terms:
[I]t creates a contract of preliminary insurance with the reserved right in the insurer to determine in good faith the applicant’s insurability; and ... if the applicant is determined not to have been an insurable risk at the time of the application the company is not liable for a death that occurs during the period covered by the receipt.

Id.

The conditional receipt in this case was functionally the same as Slayton’s; indeed, it employed some of the same language and provided that insurance coverage would not become effective prior to delivery of the policy “unless and until each and every one of [certain] conditions have been fulfilled exactly.” Those conditions included, among others, a requirement that “the Company must be satisfied that each person proposed for insurance or annuity in this application is a risk insurable by the Company under its rules, limits, and standards for the plan and the amount applied for without any modification either as to plan, amount, riders, supplemental agreements, and/or the rate of premium paid.” The receipt further specified, as did Slay-ton’s, that “[i]f one or more of the conditions of paragraph 1 have not been fulfilled exactly, there shall be no liability on the part of the Company except to return the applicable payment in exchange for this Receipt.” And as Southern Farm Bureau did here, the defendant insurer in Slayton found that the applicant was not insurable on the day that the application was made.
The Slayton court did not find it necessary to engage in a discussion of the legal intricacies of conditions precedent, instead going straight to the heart of the disposi-tive issue and holding that “[u]nless that decision [that Slayton was uninsurable] was not made in good faith it is conclusive of the company’s nonliability.” Id. The court then concluded, with no apparent difficulty, that “the record shows good faith beyond reasonable dispute.” Id. What, exactly, the Kentucky court considered in finding good faith is certainly of significance in this case, although it would be hard to discover its importance from reading the majority opinion in this appeal. The Slayton court’s complete analysis is as follows:
Commonwealth Life Insurance Company had refused to insure Slayton on the ground of his uninsurability. Underwriting manuals of several companies classed a person with Slayton’s medical history as uninsurable. The opinion stated by several witnesses for the claimant here, that prudent and careful underwriters would not have rejected insurance for a person with Slayton’s history, does not in our opinion tend to establish bad faith in the rejection by *413 the appellant here in view of the positive evidence that Commonwealth Life had rejected him and that other company’s [sic] manuals classed a person with his history as uninsurable.
Id. As a result, the court in Slayton reversed the trial court’s judgment, thereby setting aside the jury’s verdict, and entered an order dismissing the plaintiffs claim. We should do the same with Riddle’s claim in this case.
Although the factual and legal postures of Riddle and Slayton are strikingly similar, the majority here has ignored at least two fundamental holdings in Slayton that should be controlling in Riddle as a matter of Kentucky state law. Perhaps the most single most dispositive element of the Slayton opinion is the court’s determination that the question of whether the insurance company acted in good faith is one of law for the court to determine. While this holding is not explicit, it is clear not only from the court’s analysis and its mandate, but also from the fact that one member of the Slayton panel “dissent[ed] on the ground that in his opinion the question of whether or not the company made the determination of noninsurability in good faith is one of fact for the jury” and thought the case should be remanded for retrial. Id. at 371. Obviously, the district court here erred in sending the question of good faith in Riddle’s case to the jury, instead of making the determination on motion for summary judgment. Once the case came before the jury, the error was compounded when the defendant sought and was denied a directed verdict on the question of good faith.
Moreover, if the existence of good faith was clear to the state court in Slayton, it ought to be equally apparent to the majority here. The record in this case simply fails to show any proof of bad faith, i.e., that the company deviated in any significant respect from its normal routine in processing the Riddle application. The first underwriter to receive the file, Jeff Lewis, was a junior member of the company, unable to approve an application for any amount of insurance over $150,000. Unquestionably, he would have had to pass the application to the next highest level for authorization, which, in any event, would not have been forthcoming until the necessary medical investigation was completed. Because Riddle’s death came to the company’s attention before the file had been transferred, it was taken over directly by the regional manager, Bobby Jo Myers, in conformity with the company’s underwriting procedure in the event of an applicant’s death. (The majority insinuates that this transfer was evidence of bad faith on the company’s part because the defendant “produce[d] no written policy or other documentation to support this claim.” But, under controlling Kentucky legal authority set out below, the company’s action in following routine procedure, even if done negligently, simply does not rise to the level of “bad faith.”)
Given the limited (and contradictory) information contained in Riddle’s initial application, the company clearly would have required investigation of Riddle’s medical records before authorizing issuance of a policy, whether or not Riddle had died during the “conditional receipt” period. The ensuing investigation turned up evidence that unequivocally established Riddle’s uninsurability, certainly at the rate quoted in the application and, quite possible, at any rate. What is missing from the majority’s recitation of the evidence in this case is the testimony, completely unrebut-ted by the claimant, that once the medical files were assembled, they were evaluated using Southern Farm Bureau’s point system to assess risk, a system taken from the risk assessment manual of Lincoln Na *414 tional Insurance, one of the company’s reinsurers. That evaluation revealed a total of 600 points in connection with the medical conditions apparent in the Riddle medical reports, a sum that was 455 points above the maximum for the standard insurance policy for which Riddle had applied. No “rated policy” at a higher premium was offered, of course, because with Riddle’s demise, there was no one to whom to make the offer.
In addition, the defendant called as a witness an industry expert in life underwriting who testified that the defendant’s underwriting process in this case fully complied with accepted standards of the life insurance industry, including the investigation of the applicant’s medical records, the review process occasioned by the applicant’s death during the underwriting process, and the handling of the notification process to the beneficiaries of the rejected policy.[1] This expert testimony is completely uncontradicted in the record and alone would have been sufficient to satisfy the Slayton court that the defendant had acted in good faith in declining to issue a policy.
What, then, is the evidence of bad faith in this case?
• As the majority notes, “[t]he issue of the defendant’s bad faith turns largely on the inference to be drawn from the evidence regarding the defendant’s motive in closely scrutinizing Riddle’s application.” But the record contains evidence that the process met industry standards, and that evidence was wholly unrebutted by the claimant.
• The majority further points to the fact that “[a]s Riddle’s file proceeded up the chain of scrutinizers, the number of medical concerns noted by each reviewer increased.” But that escalation was due in no small part to the fact that medical records and medical opinions continued to come in while the underwriting process was in progress, revealing even more dramatically each time a report was received the extent of Riddle’s duplicity in the original application.[2]
• The majority faults two of the reviewers for “cit[ing] rheumatoid arthritis as a concern despite a blood test that returned negative for that condition.” But what the majority fails to note is what the blood test did show, i.e., that Riddle was suffering from a long-term, severe case of psoriatic arthritis, which carries the same rating for insurance underwriting purposes as rheumatoid arthritis. Expert medical testimony revealed that psoriatric arthritis and rheumatoid arthritis are both auto-immune diseases; they share the same symptoms; and they are routinely confused with one another, even by medical experts, who sometimes use the terms interchangeably. Indeed, the notes of Riddle’s primary physician *415 continued to refer to his condition as “rheumatoid arthritis,” even though he was treating his patient for psoriatic arthritis. Significantly, the two diseases are treated with equally heavy-duty medications, including Methotre-xate, which Riddle had been taking for a lengthy period of time, estimated at “10-20 years.” One outside medical expert testified that the safe lifetime dosage of Methotrexate — a medication used only in severe cases of psoriatic or rheumatoid arthritis — is 1,500 mg. Riddle’s records reflected that at the time of his death he had taken 3,900 mg., more than twice the recommended life-time dosage, but he did not indicate that he was taking Metho-trexate on his insurance application. Riddle also did report that he was taking prednisone. Indeed, one expert witness testified that as a long-term user, Riddle was “prednisone-depen-dent,” risking serious side effects. Records indicate that his physician had been trying to wean Riddle from the medication for at least two years, without apparent success.
• The majority also cites as evidence of bad faith the fact that “reviewers seized upon a reference to alcohol abuse in a 1996 letter from Dr. Yusuf Deshmukh, a reference that [one of the reviewers] acknowledged to be Vague,’ despite the absence of any mention of alcohol abuse in the medical records from Dr. Phil Aaron, Riddle’s treating physician.” But read in context, Dr. Deshmukh’s reference to alcohol abuse was actually a confirmation of information apparently received from Dr. Aaron (Riddle “is as you recall abusing alcohol and cigarettes and I have talked to him regarding those, to stop smoking as [well] as to stop alcohol”). The notation was important, the record shows, because alcohol should not be consumed by someone on Methotrexate, which has an undesirable “synergistic effect with alcohol” that can result in serious liver damage. Moreover, more than one lab report in the record indicates that the level of GGT in Riddle’s liver was elevated some 2.5 times above normal, a test result normally associated with alcohol abuse. Riddle’s abuse of cigarettes was also significant because he suffered from chronic obstructive pulmonary disease (COPD), a condition that, according to the record is “irreversible and usually progressive,” making it “important for the patient to quit smoking, otherwise it is very difficult to ever successfully gain control of the disease.” However, Riddle indicated on his application for insurance that he was smoking a pack to a pack- and-a-half of cigarettes daily, in spite of Dr. Deshmukh’s “long discussion with him” concerning the need to stop smoking. He had been hospitalized several times within the three years prior to his death for bronchitis and related pulmonary ailments. All this was in addition to medication that Riddle was taking for chronic high blood pressure, which, less than a year prior to his death was reported as “hypertension not controlled by medication.” And, yet, when asked by the insurance agent when he had last seen a physician and why, Riddle responded merely that he had seen Dr. Aaron in that past spring for “allergy symptoms, no complications.”
• Finally, the majority pins a “bad faith” label on the fact that “[t]he defendant received Riddle’s medical records from Dr. Aaron the same day the company learned of his death” and speculates that “[t]he fact that more medical records were requested the very next day *416 might be explained by the defendant’s concern over previously unknown health problems mentioned in those records.” But the company would have been negligent not to request more records after learning that Riddle had suffered from severe psoriatic arthritis and persistent COPD and, moreover, Riddle had signed a form in connection with his application that authorized an additional medical examination and various lab tests to be used in the underwriting process. No bad faith can be attributed to the defendant in seeking to secure and act on the results of those tests.
Would the Slayton court have found this purported evidence. of bad faith sufficient to overcome testimony regarding the defendant’s good faith in rejecting the application? Applicable Kentucky state law strongly suggests that it would not. Indeed, mere invocation of the words “bad faith” by the claimant cannot serve to transform otherwise legitimate actions and responses by the company into “evidence” sufficient to counteract a motion for judgment as a matter of law. We have previously recognized that Kentucky law imposes a significantly greater burden upon a claimant in Riddle’s position. In Big Yank Corp. v. Liberty Mutual Fire Insurance Co., 125 F.3d 308, 312 (6th Cir.1997), we stated:
Under Kentucky law, an insured may recover damages for an insurer’s bad faith only upon a showing that the insurer committed some intentional wrongful conduct. See Curry v. Fireman’s Fund Ins. Co., 784 S.W.2d 176, 177 (Ky.1989) (resurrecting the tort of bad faith as a viable cause of action in Kentucky after it had briefly been abolished); Blue Cross & Blue Shield of Kentucky, Inc. v. Whitaker, 687 S.W.2d 557, 559 (Ky.Ct. App.1985) (“[A]n action for bad faith ... requires something more than mere negligence. The term itself implies some intentional wrongful conduct.... Mere errors in judgment should not be sufficient to establish bad faith.”)', see also Matt v. Liberty Mut. Ins. Co., 798 F.Supp. 429, 434 (W.D.Ky.1991) (“... [M]ere negligent conduct will not support a bad faith action [under Kentucky law]. Liability for bad faith will arise only in those instances where an insurer acts with some degree of conscious wrongdoing, recklessness or in a manner which reveals an unjustified gamble at the stake of the insured.”), aff'd, 968 F.2d 1215 (6th Cir.1992).
(Emphasis added.) Relying upon medical records submitted by physicians and adhering to industry practices fall far short of exemplifying the types of affirmative misconduct required to impose liability upon Southern Farm Bureau in this case.
Likewise, Riddle cannot simply excise portions of the appellate record, thus eliminating uncontradicted explanations for the company’s actions and decisions, and then argue that he has provided evidence of bad faith and created a “disputed issue of fact ... upon which reasonable minds could differ.” Washington v. Goodman, 830 S.W.2d 398, 400 (Ky.Ct.App.1992). In fact, by considering all evidence properly before the district judge in this matter, even drawing all reasonable inferences from that evidence in favor of Riddle, I would find that “there is a complete absence of proof,” id., of any bad faith on the company’s part in denying insurance coverage to the claimant. The district court thus should have granted the defendant’s motion for judgment as a matter of law.
Under applicable principles of Kentucky law, the district court, and not the jury, was charged with the responsibility of determining whether the company’s actions in this case could be construed as bad *417 faith. Because I fail to see how full consideration of the evidence presented could possibly lead to a finding that such an improper motive existed here, I respectfully dissent from the majority’s contrary conclusion.

. This witness, Richard Usry, a reinsurance underwriting vice president for a large national reinsurance company, was also asked to review Riddle's medical records without knowing that Riddle was deceased, and came to the conclusion that Riddle was uninsura-ble, based on his use of Methotrexate for over 10 years, his history of alcohol abuse, his elevated GGT level, and his rheumatoid or psoriatric arthritis, which he would have rated equally.

. For example, asked if he suffered from arthritis, Riddle reported only that he had osteoarthritis, a degenerative disease suffered by almost everyone beyond a certain age and certainly not a condition that would cause a red flag on his file. Later medical reports indicated that the osteoarthritis was in Rid-die’s knees, arms, shoulders, and lower spine, He did not reveal that he had been treated for severe psoriatic arthritis or that he had been on Methotrexate for over ten years.